# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-09-00439-CV

**Ronald A. Brumback, R. John Fletcher, Steve Benson, Susan Sundell, John T. Manaras, and McGuinness & Manaras LLP n/k/a Anderson, Gorecki & Manaras LLP, Appellants**

**v.**

**Charles Paul Steele, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-08-000868, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellants Ronald A. Brumback, R. John Fletcher, Steve Benson, Susan Sundell, John T. Manaras, and McGuinness & Manaras LLP (now known as Anderson, Gorecki & Manaras LLP) appeal the district court's order denying their special appearances. In 2004, appellee Charles Paul Steele, while providing independent contractor services in Texas to CertaLogic Inc. (formerly known as 4DataLink Inc.), agreed to a deferred compensation plan that would transform those amounts of compensation for his services that CertaLogic had been unable to pay into benefits under the plan. After CertaLogic terminated his services in 2005, and not having received any payment under the deferred compensation plan, Steele filed suit against CertaLogic and appellants, asserting various causes of action relating to the terms of the plan as well as the circumstances surrounding CertaLogic's offering and Steele's acceptance of the plan.

Appellants filed special appearances, challenging the district court's personal jurisdiction over them. Each appellant is a nonresident of Texas. Brumback, Fletcher, and Benson were directors of CertaLogic when the deferred compensation plan was approved by the board of directors, offered to Steele in Texas, and agreed to by Steele in Texas. We affirm the district court's denial of Brumback's, Fletcher's, and Benson's special appearances. Sundell and Manaras are officers of CertaLogic, but did not become officers until after Steele's agreement to the Plan. Also prior to becoming an officer, Manaras and his law firm provided legal services to CertaLogic with regard to the termination of Steele's services as independent contractor. We reverse the district court's denial of Sundell's, Manaras's, and McGuinness & Manaras's special appearances, and render judgment dismissing the case against them for lack of personal jurisdiction.

*Factual and Procedural Background*

Steele began providing services on an independent contractor basis to 4DataLink Inc. ("4DL") in the spring or summer of 2002. 4DL offered "an operations data management and data integration software platform and a family of operations management software applications for physical-network-based businesses" providing "electric utility and cable/broadband" services. During the entire time Steele was providing services to 4DL, the company experienced financial difficulties. As a result, Steele did not receive the full amounts of his agreed monthly compensation.

On April 3, 2004, 4DL provided Steele with a letter—signed by Brumback, 4DL's chief executive officer—which set out the terms of, and offered Steele participation in, a "Deferred

Compensation Plan" (hereinafter, the "Plan"). According to the letter, the difference between the amount previously discussed as Steele's "eventual cash compensation" and the amount that had actually been received for prior months would be "treated as deferred compensation." Payment of such deferred compensation by the Plan would be at the discretion of 4DL's board of directors and contingent on the company's financial performance. The obligation was unfunded and unsecured. Steele's right to receive the deferred compensation would not cease upon the termination of his independent contractor or employee relationship with 4DL. The letter also provided for a future grant of 4DL stock:

> As additional recognition of your dedication during this start-up period, 4DL will set aside for the benefit of everyone receiving this letter a total of one percent of the currently contemplated fully diluted shares of the company as fully vested shares of 4DL common stock. . . . The grant of fully vested shares described in this paragraph . . . will more than likely be made within three months from the date of this letter.

Steele signed the letter on June 1, 2004, below the phrase "I accept the terms and conditions of the Deferred Compensation Plan as described in this letter."

In May 2005, Steele received a letter from Brumback confirming the conclusion of Steele's independent contractor arrangement with 4DL as of May 31, 2005 (hereinafter, the "Termination Letter"). Under the terms of the Termination Letter, Steele would receive a "final check" of $2,500 following his provision to Brumback of any 4DL business information held by Steele. The letter also referenced the Plan:

> In addition, 4DL will send you a statement confirming the amount of deferred compensation that 4DL owes you at such time as that amount is paid per the terms of the 4DL Deferred Compensation Plan dated April 3, 2004 and subsequently

3

executed by you. If you wish to retain the 4DL computer you are using, please so indicate when you return this document, and 4DL will deduct its depreciated value ($839.64) from the current balance of your deferred compensation and send you a statement reflecting the amended balance. The amount covering your entire period as an independent contractor with 4DL is $150,833.32.

Steele signed the letter on May 11, 2005, below the phrase "I confirm my agreement with the foregoing understandings." To date, Steele has received no stock or compensation under the Plan, and has received no further compensation from 4DL following the final $2,500 payment referenced in the Termination Letter.

On March 13, 2008, Steele filed suit against 4DL, which was now named CertaLogic, Inc. (the corporate name change occurred in early 2006). Steele alleges claims under the Texas Securities Act that CertaLogic made an unlawful sale of unregistered securities, *see generally* Tex. Rev. Civ. Stat. Ann. art. 581-7 (West Supp. 2009), and made an untrue statement of material fact when offering or selling a security, *see generally id.* art. 581-33 (West Supp. 2009). Steele also asserts claims for breach of contract, quantum meruit, common law fraud, statutory fraud, fraudulent nondisclosure, breach of fiduciary duty, negligent misrepresentation, negligence per se, and intentional infliction of emotional distress. All of Steele's claims center on the terms of the Plan, the representations or omissions that induced Steele to agree to the terms of the Plan, or CertaLogic's alleged failure to pay compensation in accordance with—or notwithstanding—the terms of the Plan.

Appellants—none of whom are residents of Texas—are also named as defendants in Steele's lawsuit. Appellants Brumback, Fletcher, Benson, Sundell, and Manaras are former or current officers or directors of CertaLogic. In addition, prior to Manaras's becoming an officer in

4

2006, appellants Manaras and his law firm McGuinness & Manaras (hereinafter, the "Manaras Law Firm") had provided legal services to CertaLogic in connection with the Termination Letter. Appellants filed special appearances, alleging that their contacts with Texas are insufficient to subject them to personal jurisdiction by the district court. *See* Tex. R. Civ. P. 120a. On July 6, 2009, the district court denied appellants' special appearances. Appellants appeal. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(7) (West 2008) (permissible interlocutory appeal).

### *Personal Jurisdiction*

We review the district court's determination of whether Texas can assert personal jurisdiction over nonresident defendants de novo. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007). When, as here, the trial court does not issue findings of fact and conclusions of law in support of its special appearance ruling, we infer all facts necessary to support the judgment and supported by the evidence. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex. 2002). The plaintiff bears the initial burden of pleading sufficient allegations to invoke jurisdiction under the Texas long-arm statute, and the nonresident defendants then assume the burden of negating all bases of jurisdiction in those allegations. *Moki Mac*, 221 S.W.3d at 574.

Texas's long-arm jurisdiction statute governs Texas courts' exercise of jurisdiction over nonresident defendants. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041-.045 (West 2008) (suit on business transaction or tort). The statute's "broad doing-business language" extends Texas courts' personal jurisdiction as far as the federal constitutional requirements of due process will allow. *See Moki Mac*, 221 S.W.3d at 575. Therefore, the requirements of Texas's long-arm

jurisdiction statute are satisfied if the assertion of jurisdiction accords with federal due process limitations. *Id.*

Personal jurisdiction is proper, based on federal due process requirements, when (1) the nonresident defendant has established minimum contacts with the forum state, and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Minimum contacts are sufficient for personal jurisdiction when the nonresident defendant "purposefully avails" himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Id.* (citing *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). There are three parts to the "purposeful availment" inquiry:

> First, only the defendant's contacts with the forum are relevant, not the unilateral activity of another party or a third person. Second, the contacts relied upon must be purposeful rather than random, fortuitous, or attenuated. . . . Finally, the defendant must seek some benefit, advantage or profit by "availing" itself of the jurisdiction.

*Id.* (citations and quotations omitted).

A nonresident defendant's contacts with a forum state may give rise to two types of personal jurisdiction. *See BMC Software*, 83 S.W.3d at 795-96. Specific jurisdiction is established if the defendant's alleged liability arises out of or is related to an activity conducted within the forum. *Id.* at 796. General jurisdiction is established if the defendant has made continuous and systematic contacts with the forum, whether or not the defendant's alleged liability arises from or relates to those contacts. *See id.* General jurisdiction requires a showing that the defendant

conducted substantial activities in the forum state, a minimum contacts analysis that is more demanding than for specific jurisdiction. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 228 (Tex. 1991).

If a court determines that a nonresident defendant's contacts with the forum are sufficient to subject the defendant to the forum's jurisdiction—whether based on general or specific jurisdiction—the court must also consider whether the assertion of jurisdiction comports with fair play and substantial justice. *See id.* The defendant must present a compelling case when his contacts with the forum state are the basis of jurisdiction, as it will be a rare case in which the exercise of jurisdiction does not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Id.* at 231 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476-77 (1985)).

***Defendants Brumback, Fletcher, and Benson***

First, we consider the special appearances by Brumback, Fletcher, and Benson. We begin with specific jurisdiction. For a nonresident defendant's contacts with Texas to support an exercise of specific jurisdiction, there must be a substantial connection between those contacts and the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 584-85. The operative facts of the litigation, here, particularly involve the terms of the Plan and the representations or omissions made to Steele regarding the Plan. Brumback, Fletcher, and Benson were each alleged to be involved with the offering of the Plan to Steele.

7

Brumback, Fletcher, and Benson were directors of CertaLogic when Steele was offered participation in the Plan, as well as during the entire time period during which Steele worked as an independent contractor. The board of directors approved the Plan.[1] Brumback was chief executive officer of CertaLogic, Benson was the executive vice president, and Fletcher was the chairman of the board of directors. Although corporate decisions were made in Massachusetts, CertaLogic's headquarters was in Richardson, Texas during the relevant time period. That address is on the heading of the April 2004 letter to Steele describing the terms of the Plan. The Plan was prepared with assistance from a law firm's Dallas, Texas office. Moreover, Steele worked in Texas, was provided the Plan-related documents at his Texas residence, and agreed to the Plan in Texas. Brumback personally signed and sent the Plan-related documents to Steele, and Fletcher admitted that "Brumback was properly authorized by the Board of Directors of CertaLogic to furnish the [Plan] to Steele for his approval and execution."

Brumback, Fletcher, and Benson generally exercised control over the operations of CertaLogic, and they specifically participated in and approved the offering to Steele of the Plan. They knew Steele resided and was located in Texas when he received the Plan-related documents and agreed to the terms of the Plan. We conclude that appellants Brumback, Fletcher, and Benson purposefully established minimum contacts with Texas in accordance with a specific jurisdiction

---

[1] Appellants assert that there is "nothing in the Record indicating how any particular member of the board voted" with regard to the Plan. However, if the plaintiff pleads sufficient allegations to invoke jurisdiction under the Texas long-arm statute, the nonresident defendants assume the burden of negating all bases of jurisdiction in those allegations. *Moki Mac River Expeditions v. Drugg*, 221 S.W.3d 569, 574 (Tex. 2007).

analysis. *See Hagerty Partners P'ship v. Livingston*, 128 S.W.3d 416, 421 (Tex. App.—Dallas 2004, pet. denied).

Having concluded that Brumback, Fletcher, and Benson had sufficient contacts with Texas to satisfy the "minimum contacts" requirement, we must consider whether the assertion of jurisdiction comports with "fair play and substantial justice."[2] *See Guardian Royal Exch.*, 815 S.W.2d at 228. This analysis involves weighing five factors: (1) the burden on the defendant, (2) the interests of the forum state in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *See id.* (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

While it may be inconvenient for Brumback, Fletcher, and Benson to litigate this matter in Texas, this lawsuit involves an alleged sale of securities to a Texas resident at a time when CertaLogic was headquartered in Texas. The execution of the relevant agreements occurred in Texas, any misrepresentations or omissions to Steele were made when Steele was working for CertaLogic in Texas, and Steele continues to reside in Texas. Resolution of the matter will likely involve the application of Texas law. This case is pending before a Texas court, and CertaLogic is a party to the lawsuit. There is no allegation that the district court is unable to further fundamental substantive social policies. We conclude that the exercise of personal jurisdiction against Brumback,

---

[2] We note that appellants in their briefing focus on the "minimum contacts" analysis and do not expressly address the factors involved in the "fair play and substantial justice" analysis.

9

Fletcher, and Benson comports with traditional notions of fair play and substantial justice. Therefore, the district court properly denied the special appearances filed by Brumback, Fletcher, and Benson.[3]

### Defendants Sundell, Manaras, and McGuinness & Manaras

Next, we consider the special appearances filed by Sundell, Manaras, and the Manaras Law Firm. We again begin with specific jurisdiction, and must analyze the degree of connectedness between the appellants' contacts with Texas and the operative facts of Steele's causes of action. *See Moki Mac*, 221 S.W.3d at 584-85. Sundell, Manaras, and the Manaras Law Firm—unlike Brumback, Fletcher, and Benson—were not directors of CertaLogic and were not involved in the approval of the terms of the Plan. We must, therefore, take a closer look at the operative facts of the litigation to determine if they are substantially connected to the actions of Sundell, Manaras, and the Manaras Law Firm.

---

[3] Appellants also contend that Steele's allegations cannot support personal jurisdiction against them because "there is uncontroverted proof that no tort was committed and/or that at least one required element of each such tort claim has been negated." Appellants' arguments focus on whether their alleged acts would have the legal effect of creating tort liability. We decline to address appellants' arguments implicating whether appellants would ultimately be held liable under Steele's claims because liability or non-liability under a given set of facts is not relevant to a minimum contacts analysis.

> [U]ltimate liability in tort is not a jurisdictional fact, and the merits of the cause are not at issue. Rather, the purpose of a special appearance is to determine whether the actions alleged by a plaintiff suggest that a defendant should expect to be subject to jurisdiction in Texas.

*Wright v. Sage Eng'g, Inc.*, 137 S.W.3d 238, 251 n.10 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (citations omitted).

Each of Steele's causes of action hinge on the terms of the Plan, or the circumstances surrounding Steele's agreement to the Plan. Steele alleges that the Plan's terms constitute an unlawful offer of securities under the Texas Securities Act, or that misrepresentations made in the April 2004 letter violate the Texas Securities Act. Steele further alleges that the representations and omissions made concerning the Plan's benefits or detriments to Steele—which representations and omissions allegedly induced Steele's agreement to the Plan—constituted fraud, breach of fiduciary duty, and negligence. Steele further alleges that CertaLogic's withholding of compensation until he agreed to the terms of the Plan constituted intentional infliction of emotional distress.[4]

Steele contends that his causes of action also implicate the terms of the Termination Letter and, therefore, that our specific jurisdiction analysis should take into account appellants' respective roles in the preparation and provision of that letter. However, the Termination Letter's only references to the Plan relate to what amounts were owed under the Plan. These references in no way create any new liability to Steele. They are, at most, a confirmation of the existence of the Plan and the obligations established by the Plan. The Termination Letter does not add new terms to the Plan, offer additional amounts of shares or stock options through the Plan, establish a time that payment will be made under the Plan, condition payment under the Plan on Steele's execution of the letter,[5] or make any promises whatsoever regarding payment under the Plan. Contrary to

---

[4] Steele also asserts causes of action for breach of contract and quantum meruit (in the event the Plan does not constitute a binding contract). However, since any contracts or agreements at issue here were between Steele and CertaLogic, it appears these claims are asserted against CertaLogic and not appellants.

[5] Steele alleges in his pleadings that "CertaLogic would not make any more payments to him unless he complied with the terms specified in the termination letter." However, the Termination Letter states only that "[u]pon receipt by me of the information mentioned above . . .

11

Steele's contentions, no language of the Termination Letter indicates that it incorporated the terms of the Plan or somehow "recommitted" whatever wrongdoing might be found in the terms of the Plan.

Having concluded that the operative facts of this litigation are confined to CertaLogic's offer and Steele's agreement to the terms of the Plan, we review the respective involvements of Sundell, Manaras, and the Manaras Law Firm with the Plan so as to determine whether the connections are sufficiently substantial to support an exercise of specific jurisdiction.

In February 2004, Sundell was named the "acting" or "interim" chief financial officer, and was an independent contractor of CertaLogic. At that time, Brumback informed Steele and others by email that Sundell would join CertaLogic as chief financial officer "when we get funding." Sundell became the chief financial officer in May 2005, almost a year after Steele's agreement to the Plan. Her sole involvement with the Plan was (1) she calculated based on CertaLogic's financial records the compensation owed to Steele, which amount would become deferred compensation under the Plan,[6] and (2) Steele was told that his signed acknowledgment that the Plan's terms replaced the previously communicated terms of his independent contractor agreement should be returned to Sundell. Sundell avers that she had no input regarding the terms of the Plan. She was not a director

_____

4DL will send you a final check of $2500 for your services for the month of May 2005." Unlike this final payment of compensation from CertaLogic, payment of deferred compensation under the Plan was not made contingent on compliance with the Termination Letter. Moreover, Steele does not allege that CertaLogic's request for him to return company-related information in connection with his termination was wrongful.

[6] Similarly, Sundell avers that her only involvement with the Termination Letter was verifying the amount owed to Steele, which amount was stated in the letter.

and did not authorize or otherwise have any vote on the Plan. While Steele alleges in this suit that the amount of compensation set out in the April 2004 documents was incorrect, he signed off on the amount, agreeing that the "amounts and calculations" were accurate, and he did not contact Sundell or anyone else with CertaLogic at that time to discuss the Plan or contest the amount stated.[7] Steele testified that his only other contacts with Sundell concerned the bookkeeping issues of "pay or expense reimbursement," and that she made no representations regarding CertaLogic securities or future payments. These actions by Sundell do not constitute "purposeful availment" with regard to Steele's claims. Sundell sought no benefit from Steele or Texas by her ministerial activities of calculating and providing compensation figures. While the amount of compensation due under the Plan may be at issue, the wrongdoing alleged in Steele's lawsuit centers on the terms under which such compensation will be or ought to have been paid.

Neither Manaras nor the Manaras Law Firm has ever represented Steele. They provided legal services to CertaLogic in connection with the May 2005 Termination Letter. They also assisted CertaLogic with responding to Steele's current lawsuit and to the demand letter sent by Steele's attorney prior to any litigation being filed. Neither Manaras nor the Manaras Law Firm provided any legal advice or services with regard to the Plan. Neither Manaras nor the Manaras Law Firm represented CertaLogic in any capacity until late 2004 or early 2005.

In addition to his provision of legal services to CertaLogic through his law firm, Manaras became an assistant secretary of CertaLogic in March 2006, and assumed the role of secretary in June 2006. Thus, Manaras was not a director or officer during the time period in which

---

[7] Steele alleges that he "felt he had no choice" but to agree to the Plan's terms.

Steele provided services to CertaLogic. Manaras did not participate in any corporate decisions (as a corporate officer or agent) involving Steele or the terms of the Plan. Given that Manaras became an officer after the Plan's execution, there is no substantial connection between Manaras's role and duties as officer and Steele's causes of actions arising from the Plan's execution.[8]

Given the operative facts of Steele's claims in this suit, the activities of Sundell, Manaras, and the Manaras Law Firm do not justify a conclusion that they "should reasonably anticipate being called into court" in Texas. *See Schlobohm v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990). Steele's allegations regarding activities conducted within Texas are not sufficiently related to the conduct of Sundell, Manaras, and the Manaras Law Firm so as to demonstrate the minimum contacts required for specific jurisdiction.

Next we consider whether the district court properly exercised personal jurisdiction against Sundell, Manaras, and the Manaras Law Firm based on a general jurisdiction analysis.[9] General jurisdiction requires a showing that the defendant has made continuous and systematic contacts with the forum state. *See BMC Software*, 83 S.W.3d at 797.

---

[8] Steele contends that the issuance of CertaLogic preferred stock to an investor in August 2006 made Steele's stock "obsolete." Even if this is true, there is no evidence or allegation that any of CertaLogic's officers approved or were otherwise involved with such issuance. Steele references the legal notices provided to that investor as evidence Steele should have received such notices, but does not explain how this implicates those appellants who were neither directors nor officers when the Plan was offered to Steele. Moreover, even if, as Steele contends, Sundell or Manaras accepted a fiduciary duty to Steele upon their becoming officers, the breach of fiduciary duty alleged in Steele's pleadings concerns only those representations and omissions made surrounding his execution of the Plan-related documents, which preceded Sundell's and Manaras's becoming officers.

[9] We note that Steele in his briefing addresses only specific jurisdiction.

14

The only time Sundell has been in Texas was in 1968, when she and her husband spent the night in Amarillo while driving from Ohio to California. The only telephone or email contacts Sundell has had with anyone in Texas were made in the course of providing ministerial services on CertaLogic's behalf while she was located in New Hampshire (at her residence) or Massachusetts (at CertaLogic's office). Steele testified that his only contacts with Sundell concerned basic inquiries regarding the timing or amount of expense reimbursement or compensation.

The Manaras Law Firm is a Massachusetts limited liability partnership with its principal—and only—place of business in Acton, Massachusetts. None of its attorneys is licensed to practice law in Texas, or has practiced law in Texas. The firm does not advertise for business in Texas. The Manaras Law Firm has had three clients based in Texas, but the services provided to those clients were performed in Massachusetts and represented less than one percent of the total revenues received by the firm during the applicable time period.

Similarly, Manaras is licensed to practice law in Massachusetts and New York, but has never been licensed to practice law in Texas. Manaras provided services to the three Texas clients of the Manaras Law Firm, but again, those services were performed in Massachusetts and represented less than one percent of the total revenues received by his firm during the applicable time period. Prior to his co-founding of the law firm, Manaras "did substantial travel both domestically and internationally, including trips to Texas during such times on behalf of and as required by [his] then-employers." In addition, he sits on the board of directors of a corporation (not affiliated with CertaLogic) that has scheduled board meetings "in various parts of the country, including some that have been held in Texas."

15

These contacts do not constitute "substantial activities" or "continuous and systematic" contacts. *See id.* Neither Sundell, Manaras, nor the Manaras Law Firm have resided in Texas, maintained an office in Texas, owned or leased any property in Texas, maintained any address or phone number in Texas, or maintained an account in a Texas bank or financial institution. Sundell's contacts with Texas, as set out in the record, generally involved communications with Steele on behalf of CertaLogic regarding administrative matters. The Manaras Law Firm's contacts with Texas were minimal and neither continuous nor systematic. Manaras's additional contacts with Texas generally occurred due to isolated business meetings not resulting from his own purposeful availment or his seeking some benefit, advantage, or profit. Neither Sundell, Maranas, nor the Manaras Law Firm could have reasonably foreseen that their respective positions and activities relevant to Texas would result in their being haled into Texas court for representations or sales made in relation to a document the terms of which they did not develop, prepare, approve, or communicate. *See id.* at 795 ("Although not determinative, foreseeability is an important consideration in deciding whether the nonresident defendant has purposefully established 'minimum contacts' with the forum state."). We conclude that—based on the record before this Court—Sundell's, Manaras's, and the Manaras Law Firm's contacts with Texas are not sufficient to show general jurisdiction.

### Conclusion

Having concluded that the undisputed jurisdictional facts demonstrate appellants Brumback, Fletcher, and Benson established the requisite minimum contacts with Texas to support the exercise of specific jurisdiction, and that such exercise would not offend traditional notions of fair play and substantial justice, we affirm the district court's denial of the special appearances

filed by Brumback, Fletcher, and Benson. However, having concluded that the undisputed jurisdictional facts demonstrate appellants Sundell, Manaras, and McGuinness & Manaras did not establish the requisite minimum contacts with Texas to support the exercise of either specific or general jurisdiction, we reverse the district court's denial of the special appearances filed by Sundell, Manaras, and McGuinness & Manaras. We render judgment dismissing the case against defendants Sundell, Manaras, and McGuinness & Manaras for lack of personal jurisdiction.

                                         _____

                                         G. Alan Waldrop, Justice

Before Chief Justice Jones, Justices Pemberton and Waldrop

Affirmed in part; Reversed and Rendered in part

Filed: April 21, 2010